IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| BRYAN B.,<br>    Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br>    Defendant. | Case No. 4:18-cv-04203-SLD-JEH |

**Report and Recommendation**

Now before the Court is the Plaintiff's Motion for Summary Judgment (Doc. 13) and the Commissioner's Motion for Summary Affirmance (Doc. 18). This matter has been referred for a Report and Recommendation. The Motions are fully briefed, and for the reasons stated herein, the Court recommends the Plaintiff's Motion for Summary Judgment be granted, the Defendant's Motion for Summary Affirmance be denied, and the matter be remanded.[1]

**I**

Bryan B. filed his applications for disability insurance benefits (DIB) and supplemental security income (SSI) on December 5, 2013 and alleged disability beginning on January 1, 2011. His claims were denied initially on July 2, 2014 and upon reconsideration on June 11, 2015. Bryan filed a request for hearing concerning his applications for DIB and SSI which was held on August 8, 2016. At that hearing, Bryan was represented by an attorney, and Bryan, a witness (Bryan's landlord), and a vocational expert (VE) testified. Bryan also then amended his

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears as (Doc. 7) on the docket.

alleged disability onset date to October 25, 2013.  Thereafter, Bryan's claims were denied on December 22, 2016.  The Appeals Council (AC) granted Bryan's request for review and remanded the case back to the ALJ.  A second hearing was held on June 5, 2018 at which time Bryan and a VE testified.  The Honorable David W. Thompson (ALJ) issued an unfavorable Decision on June 15, 2018.[2]  Bryan's request for review of that second decision was denied by the AC on August 1, 2018, making the ALJ's June 15, 2018 Decision the final decision of the Commissioner.  Bryan filed the instant civil action seeking review of the ALJ's Decision on October 5, 2018.

## II

At the first hearing in August 2016, Bryan was 52 years old and living in part of a duplex that was rented to him by his neighbor, Robert Genisio (who later testified at the hearing).  Bryan had an eighth-grade education.  Bryan claimed his ability to work was limited by lower back/disc issues, anxiety, and depression.  AR 458.  In 2003, Bryan underwent a bilateral lumbar laminectomy at L4-5 and a discectomy at the central L4-5 and Left L5-S1.  AR 585.  He provided at the hearing that in September 2015, he underwent a fusion during which time three of his vertebrae in his cervical spine were fused together.  Bryan described that the surgery was performed by going through the front of his neck and inserting a plate with screws and a cadaver bone.  At one point during the hearing, Bryan asked if he could stand for a minute and noted he had ice on his back.

Bryan testified that his income included $245 per month from Galesburg Township and from mowing two yards for his landlord.  His landlord put $20 each time Bryan mowed toward what Bryan owed in rent.  Bryan also testified he helped his neighbor with "little chores," and the money from doing so also went

---

[2] The June 15, 2018 Decision is the one under consideration herein.

toward Bryan's rent. AR 86. He said he would probably help his neighbor for ten hours over the whole then-current year, and elaborated, "If I may say something, that sometimes even [his neighbor] has to cover me on the yard, too, because I cannot do it." AR 87.

Bryan said he took tramadol and hydrocodone for pain, and he took narcotic pain medication on a daily basis for the last four years. His family doctor, Jeffrey Hershkowitz, D.O., prescribed the hydrocodone. Bryan said he also took gabapentin for fibromyalgia pain. He took diazepam for anxiety, Depakote for bipolar disorder, levothyroxine for a thyroid disorder, and trazadone to help him sleep. He took 800 milligrams of ibuprofen at night.

Bryan was not currently seeing a mental health counselor but was doing so previously several months before the hearing. He was able to take care of his own personal hygiene needs and was able to prepare meals for himself, do his own laundry, do his own dishes, and do house cleaning. He added that it had "been a struggle this year" to do his own vacuuming, dusting, mopping, and sweeping. AR 102. As for the lawn mowing he did, Bryan testified that he paid "a big price for doing what I do now. My body goes down." AR 103.

Upon questioning by his attorney, Bryan testified he mowed twice in the then-current year and when he attempted to catch up on his mowing by doing it all in one day, he "paid for it. I laid on the couch for three, four days, and back up, and ready to mow again." AR 104. He said he struggled to mow that year even though he rested a couple days between mowing jobs. Bryan also detailed that he "paid for" shoveling snow once the previous year and "[i]t hurt [him] bad." AR 105. He "went down probably two weeks after that last . . .snow we had." AR 106. Bryan added that while he was able to do household chores, there were times he could not do so, his house was the dirtiest it had ever been, and he became

worse that year. He said he kept going out and doing what he did because he had to have a roof over his head.

Bryan explained he changed his onset date to October 2013 because that was when another man for whom he was working at the time hit him on the back with a pickaxe. It was then that Bryan stopped all work. As for sleep, Bryan stated he could not figure out a way to sleep so that he would not wake up and feel like he had been in a bar fight.

The ALJ then asked Bryan about the extent of his pain. Bryan described his pain to be better some days and worse on others. His typical pain level was at a five and a half. He considered that level of pain to be a "pretty good day." AR 118. He could get down to a four on a better day, but he had reached a 10 the last year in the summertime when he was mowing grass. Bryan said he was "down for a month." AR 119. He then said he was "down" for a month and a half in the then-current year.

Robert Genisio, Bryan's landlord, testified that he had known Bryan for three years. Robert testified he would not see Bryan for days at a time because Bryan's back hurt him so much. He said Bryan mowed as often as Robert liked him to do so, that he did not have to prompt Bryan to do so, and if Bryan was unable to mow because of pain Robert would do so. Robert or his wife sometimes drove Bryan to his medical appointments, particularly at times when Bryan could not ride his bicycle because his back was bad. Robert explained that Bryan rode his bike to the doctor, to Hy-Vee to get his prescription, and then back home (a trip of about 18 miles) "three, maybe four" times in the last year. AR 131.

At the second hearing in June 2018, Bryan testified that since the last hearing in August 2016 the injections he had been receiving in his neck and low back had become less effective. He explained the length of time they provided relief was shorter, and one of his doctors informed Bryan he felt the injections were doing

more harm than good to his body. Bryan also explained that doctors informed him additional surgery and a spinal cord stimulator were not options. As for the latter, he said the doctor told him Bryan's pain was too severe for the stimulator to work.

Bryan reiterated that the pain became worse since the last hearing and described:

> I call it – I'd call it my nerve – it gets a hold of my nerve, and when it gets a hold of that nerve, it is – it is – it just – it grabs me to where each little move that I make or twinge or anything, it's a pain that's stabbing. It's very, very, very painful in so many ways.

AR 51. He said since the previous hearing, the dishes and vacuuming "[got] him going" and that it seemed like he was "going to pay for it, hurt-wise" to "do something anymore." AR 51. In the last year and a half, Bryan's brother and daughter started to come to his home and do household chores for him.

Bryan testified that he used a cane as it helped him from falling and helped stabilize him. Bryan said his legs gave out which caused him to fall. When noted by the ALJ that he did not have a cane with him at the hearing, Bryan stated, "I'm grateful that I don't need it today." AR 56. He elaborated that had the ALJ seen him three weeks before, he would have seen Bryan using the cane as his back pain was severe at that time. He acknowledged he did not need the cane to walk every day. Bryan also testified to the numbness in his left hand which he was told would never go away and his anxiety which affected his depression. Bryan agreed that almost anything could cause his severe pain to "jump and get [him]." AR 57.

Also, since the last hearing, Bryan believed he went to the emergency room for mental health issues twice. He testified:

> It has – it has to do with my mentality and the pain – the pain taking over my brain, which I – I know those ain't words to use, but I don't know how else to use what I'm trying to say, but – but I – I state that

when my pain is so bad, it does – it does affect my brain and the way I think; terribly.

AR 58. He testified it had been a bad year and that his "nerve" had him down for a period of almost six months such that he was capable of doing hardly anything. AR 59. Bryan later corrected himself that he believed he went to the emergency room five times because of his pain since the last hearing.

### III

At Step Two of the Decision, the ALJ determined Bryan had the following severe impairments: degenerative disc disease of the lumbar and cervical spine; personality disorder; anxiety; and affective disorders. AR 16. The ALJ made the following residual functional capacity (RFC) finding:

> [T]he claimant has the [RFC] to perform light work . . . except he is **limited to occasional climbing of ladders; limited to no climbing of ropes and scaffolds; limited to occasional crawling; limited to frequent reaching in front and to the side with the non-dominant upper extremity; limited to occasional overhead reaching with the non-dominant upper extremity**; because of all the claimant's mental impairments and symptoms combined, he may, during times of symptoms exacerbation have moderate limitations in (1) concentration, persistence and/or pace when attempting certain detailed tasks, **so he is limited to jobs that only require up to detailed but uninvolved tasks with few concrete variables, little in the way of change in job process from day to day, jobs that can be learned in 30 days or fewer, and jobs with multistep, self-evident tasks, easily resumed after momentary distraction, and (2) social functioning, so he is limited to jobs that do not require more than occasional work-related interaction with the public, co-workers and supervisors.**

AR 19 (bold in original).[3]

---

[3] The ALJ explained, "Only the **bold** type in the paragraph constitutes the [RFC]. The remaining language is merely introductory and does not constitute any portion of the [RFC]." AR 19 (bold in original).

The ALJ summarized Bryan's hearing testimony, presented a chronology from September 2013 to April 2018 of his medical records, and weighed the opinion evidence. Included in those medical records were Bryan's ongoing complaints of pain, cervical spine and lumbar spine imaging results, and the medications he was prescribed. Imaging of his cervical spine in September 2013 showed degenerative disc disease with left posterior disc bulge which resulted in neural foraminal narrowing and mild to moderate central spinal stenosis. An x-ray of his lumbar spine in July 2014 showed degenerative changes at L4-L5 and L5-S1. Imaging of his lumbar spine in August 2014 showed degenerative and surgical changes without significant compromise of the spinal canal or neural foramina. A June 2015 cervical spine MRI showed degenerative foraminal narrowing predominantly on the left at multiple levels. A March 2017 lumbar spine MRI showed degenerative changes most predominant at L3, L4-L5, and L5-S1 with foraminal narrowing. MRIs reviewed in December 2017 showed prior laminectomies without significant canal or foraminal stenosis, and a disc bulge causing foraminal stenosis. At times, physical examination of his low back, left upper extremity, and cervical spine revealed tenderness, limited range of motion, spasm, and decreased range of motion.

Between 2013 and 2018, Bryan was prescribed Cymbalta, referred to an orthopedist, received epidural injections, narcotic pain medication, offered fusion surgery from C5-C7, underwent cervical fusion surgery (in September 2015), referred to a neurosurgeon, underwent a right medial branch block, underwent a Kenelog injection of the right shoulder, referred for a consultation for a spinal cord stimulator, continued on his medications, referred for x-rays, referred to a pain clinic, and referred to a pain specialist. During that time period, the ALJ noted no less than 11 instances in which Bryan received either a cervical or lumbar spine steroid injection. One of Bryan's doctors wrote a letter in May 2017 which

indicated he had treated Bryan since 2013 for back and neck pain, Bryan had received injections during that time, the injections became less and less effective and Bryan's pain relief was temporary, and the doctor informed Bryan he no longer felt comfortable performing further epidural injections. The doctor further wrote that Bryan should "peruse" possible surgical options and if it was determined he was not a candidate for surgery, "long term medical management from a multi-disciplinary pain clinic would be his next step." AR 1470.

Bryan went to the emergency room with complaints of back pain in June 2014, May 2017, November 2017, and March 2018. It was during that visit in March 2018 that Bryan stated he could not live with the pain and wanted to check himself into a mental institution. He went for a consultation in July 2015 for neck pain radiating to both arms, for a consultation in November 2017 for back pain, for discussion with a certified physician's assistant in November 2017 about his ongoing issues with back pain, for consultation in December 2017 for pain in various areas including the shoulders, back, and buttocks, and for consultation in April 2018 for low back pain.

Orthopedist Steven Potaczek, M.D. wrote in a February 11, 2014 letter that Bryan "has been unable to work due to CERVICAL AND SPINE CONDITION . . . [Bryan] may not yet return to work AS HIS CONDITION IS GUARDED." AR 938 (emphasis in original). Advance Practice Nurse (APN) Laura M. Fullerton with Knox Community Health Center wrote in a February 13, 2014 letter that Bryan "has been and is a current patient at the health center," that he was referred to Dr. Potaczek for orthopedic issues and pain control, that he "has also been referred to the pain clinic for pain control," and that she had read Dr. Potaczek's note and concurred that Bryan "is unable to work." AR 939. In a September 2014 letter, Dr. Hershkowitz wrote that he recently started seeing Bryan as his primary care physician. Dr. Hershkowitz continued:

8

> Bryan has a significant medical history with regards to degenerative cervical disease as well as degenerative lumbar disk disease of which he has had previous surgery. We also presently treating [sic] him for anxiety and depression and hypothyroidism and we recently adjusted his medications and have referred him for epidural steroid injection . . . We in no way will be able to cure Bryan with regards to his underlying conditions, but hopefully to get [sic] them under control that [sic] he can at least function on a daily basis with regards to ADLs. His examination is still very significant with regards to limping with regards to the left leg, significant decreased range of motion of the cervical spine, back pain with straight leg raising, paresthesias with regards to the fingers.

AR 1034. Dr. Hershkowitz then explained Bryan would be referred to physical therapy, his medication regimen was continued as is, and he was referred for "hopefully" a second and third lumbar epidural steroid injection. The doctor concluded, "I do not see or anticipate anytime [sic] in the future that Bryan will be able to hold down any meaningful type employment because of his above medical conditions." *Id*. Dr. Hershkowitz, wrote in an April 9, 2015 letter that Bryan had a history of cervical spinal stenosis and lumbar radiculopathy, had epidural steroid injections in both the neck and back, and had significant anxiety and depression. Dr. Hershkowitz explained, "We are presently still in the process in terms of active treatment for his comorbidities," and:

> From the medical point of view, I do not see in terms of where this patient is able to be employed in any job situation due to his comorbidities, and certainly would consider him in terms of disabled based on his medical conditions which do have some room potentially for improvement, but certainly not for cure. He is also on some medications which have the potential for impairment which would certainly put him at risk at any sort of employment issue.

AR 1030.

The ALJ gave "little weight" to Dr. Potaczek's, APN Fullerton's, and Dr. Hershkowitz's opinions. As for "the statements of the claimant's doctors that his

9

pain is so severe he would qualify for disability and cannot work," the ALJ gave those statements "no weight." AR 29-30. The ALJ rejected those statements as they did not offer any specific work related limitations, appeared to be based solely on Bryan's subjective complaints of severe pain, the doctors did not cite any objective findings to support their statements, and the doctor's examinations of the claimant on the particular dates did not show Bryan to be in severe distress due to pain.

## IV

Bryan argues the ALJ erred in the following seven ways: the ALJ failed to build a logical bridge between the assistive device prescription and lay opinion evidence to his conclusion Bryan was not disabled pursuant to the Grid Rules; he erred because the factual basis of his conclusion regarding the effectiveness of Bryan's treatment was not supported by substantial evidence; he erred in weighing the opinion evidence; his credibility assessment was patently wrong; he erred by finding Bryan could perform work based on an inadequate RFC; he improperly inferred Bryan was capable of light work because he performed maintenance work so he would not be homeless; and he erred by failing to apply the borderline age rules of the Medical-Vocational Framework.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper

legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. §§ 404.1566; 416.966. The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.[4] In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2) suffers from an impairment that is severe or whether a combination of her impairments is severe;

3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

---

[4] The standards for establishing a disability in order to receive DIB and SSI are materially the same. *Compare* 20 C.F.R. § 404.1501 *et seq.* (DIB) *with* 20 C.F.R. § 416.901 *et seq.* (SSI). Thus, the Court may at times only cite to the DIB regulations.

> 4) is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and
>
> 5) is unable to perform any other work existing in significant numbers in the national economy.

*Id.* An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, Bryan claims error on the ALJ's part at Step Four.

### A

### 1

Though Bryan lobs numerous attacks on the ALJ's Decision, the Court need not address all of them to assure itself this case must be remanded. Bryan argues the ALJ failed to properly apply the regulatory factors that govern the weighing of opinion evidence in concluding he would give "little weight" to the opinions of Dr. Hershkowitz, Dr. Potaczek, and APN Fullerton. Bryan argues more specifically that that ALJ did not properly evaluate primary treating physician Dr. Hershkowitz's opinion which, Bryan says, warrants controlling weight under the regulations. The Commissioner argues no treating source opined on Bryan's functional physical limitations and no medical source opined that he was unable to perform light work; thus, for that reason alone, the ALJ's Decision must stand.

The Commissioner avoids the obvious defects with the ALJ's discussion and weighing of the medical opinion evidence.

>20 C.F.R. § 404.1527(c) provides:
>
>How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

The listed factors include: 1) examining relationship; 2) treatment relationship, which in turn includes length of the treatment relationship and the frequency of examination, and the nature and extent of the treatment relationship; 3) supportability; 4) consistency; 5) specialization; and 6) other factors brought to the Social Security Administration's attention. *Id.* An ALJ must give controlling weight to the medical opinion of a treating physician only if the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(c)(2).[5]

Here, the ALJ assigned only "little weight" to the opinions of Bryan's treating D.O. (Dr. Hershkowitz), treating orthopedist (Dr. Potaczek), and APN (Fullerton) who concurred with the orthopedist's note that Bryan was unable to work because "the opinion that a claimant is disabled is one reserved for the Commissioner" and "all of these letters are conclusory and do not cite specific objective medical findings to support their conclusions." AR 28. True, "'the final responsibility for deciding' [RFC] (ability to work – and so whether the applicant is disabled) 'is reserved to the Commissioner.'" *Bjornson v. Astrue*, 671 F.3d 640, 647-48 (citing 20 C.F.R. § 404.1527). However, the Seventh Circuit has explained:

---

[5] The treating physician rule found in 20 C.F.R. § 404.1527 has since been eliminated by the Social Security administration. However, the rules in § 404.1527 apply to claims filed before March 27, 2017.

13

> Whether a claimant qualifies for benefits is a question of law, but a medical opinion that a claimant is unable to work it not an improper legal conclusion. Indeed, ALJs must consider medical opinions about a patient's ability to work full time because they are relevant to the RFC determination.

*Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018). Here, the opinions did not flatly state Bryan was disabled as they provided the reasons why (including diagnoses and treatment modalities) the medical sources determined Bryan was unable to work. Also missing from the ALJ's Decision is any meaningful consideration of the § 404.1527 factors. For instance, no consideration was explicitly given to the medical sources' examining relationship, treatment relationship, or specialization. Also, while the ALJ faulted these three medical sources for not citing specific objective medical findings to support their conclusions, the ALJ was the one tasked with determining the supportability of their opinions. Similarly, the ALJ's stated reason to reject other doctors' statements that Bryan's pain was so severe that he would qualify for disability and could not work – because they did not "offer any specific work related limitations" – erroneously puts the burden on medical sources to essentially craft an RFC in any opinions they may provide.[6] Perhaps most glaring to the Court is the ALJ's failure to recognize in his Decision that not one, not two, but *five* medical sources opined Bryan was unable to work. As Bryan points out in his brief, neurosurgeon Konstantin Slavin, M.D. opined in November 2017 that he did not expect Bryan to be able to return to productive work as long as he suffered from severe pain and required high doses of opioids, and neurosurgeon Sanjay Yadla, M.D. in April

---

[6] 20 C.F.R. § 404.1545(a)(1) provides: "Your impairment(s), and any related symptoms, such as pain, may *cause physical and mental limitations that affect what you can do in a work setting*. Your residual functional capacity is the most you can still do despite your limitations. We will assess your residual functional capacity based on all the relevant evidence in your case record." (emphasis added).

2018 thought Bryan would have difficulty finding meaningful work in light of his history and the relevant imaging of his back.

As for the ALJ's consideration of treating Dr. Hershkowitz's opinion, the ALJ's attempt to undermine a discrete portion of that opinion (Bryan's limping gait) fares no better than his consideration of the medical opinions as a whole (as discussed above) or Dr. Hershkowitz's specifically. The ALJ did not cite to Dr. Hershkowitz's "actual physical examination which all [sic] note a normal gait;" he cited to assessments done by different doctors. Moreover, the ALJ appears to have forgotten that the length of a treatment relationship and consistency are factors to consider when weighing a medical opinion. Though the ALJ rejected Dr. Hershkowitz's numerous "Physician Medical Reports" dated between October 2015 and November 2017 as opinions which invaded the purview of the Commissioner, his opinions stated in those Reports that Bryan was unable to work full-time or part-time and would not be able to work were consistent with his earlier, same opinion in September 2014. The ALJ's stated reason that Dr. Hershkowitz did not provide any citations to the objective medical records in support of his conclusions fails for the same reason it did with respect to the other medical source opinions; the ALJ was the one tasked with determining the supportability of Dr. Hershkowitz's opinions as set forth in the Reports. The additional reason the ALJ provided to reject those Reports – that Dr. Hershkowitz did not provide any specific functional limitations – is rendered insubstantial in light of his insufficient application of 20 C.F.R. § 404.1527 to the medical opinions of record generally and its application to Dr. Hershkowitz's opinions specifically.

To satisfy the substantial evidence standard, "the ALJ must build an accurate and logical bridge from the evidence to [his] conclusion" and "an ALJ may not ignore evidence that undercuts [his] conclusion." *Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018). Here, where the record contains evidence of Bryan's

back surgery, his repeated and consistent complaints of back pain, his medication regimen to treat his continued complaints of pain, his continued pursuit of relief from that back pain via trips to different doctors over several years' time, third-party letters from his landlords providing their observation of Bryan in pain and struggling to walk, his pastor's statements confirming Bryan's ongoing complaints of pain, his inability to avail himself of treatment options (spinal cord stimulator, further surgery) for reasons beyond his control, and several opinions providing his back pain prevented him from working, the ALJ did not build the requisite logical bridge between such evidence and the conclusion that the several medical source opinions were due only "little weight" or that Bryan's doctors' statements as to his pain were due "no weight." The ALJ's articulated reasons to reject those opinions did *not* amount to a confrontation with the contrary evidence of record nor an explanation sufficiently explaining why such contrary evidence was rejected. *See Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) ("Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected").

**2**

The Court is confounded to see that the ALJ gave no weight to Dr. Hershkowitz's opinion that Bryan needed a cane. On November 4, 2017, Dr. Hershkowitz placed a Medical Equipment Order which provided:

> Length of Need (# of months; 99=lifetime):  99
> Patient has a mobility limitation that significantly impairs his/her ability to participate in one or more mobility-related activities of daily living . . . in the home . . . YES
> Patient is able to safely use the cane . . . Yes
> Patient functional mobility deficit can be sufficiently resolved by use of a cane . . . Yes

AR 1706. The associated diagnosis was listed to be "Low back pain radiating to both legs." *Id*. The ALJ concluded that the factors he considered were "not indicative of a medical necessity for an assistive device." AR 29. SSR 96-9p provides:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case.

SSR 96-9p at *7. Oftentimes the Commissioner is heard to argue a claimant's cane use was not a medical necessity where there was no prescription for one. In this case, the ALJ has managed to reject evidence of the medical necessity of a cane – an actual prescription by, at that point, Bryan's long-time treating doctor – because, as the ALJ put it, "the medical evidence fails to establish the claimant needs any assistive device to ambulate." AR 29. The ALJ pointed to a lack of evidence that Bryan had any type of assistive device with him when he sought medical treatment, and his muscle strength in his lower extremities was 5/5 and he was not noted to have muscle atrophy. The certain fact of record is that Bryan's treating doctor, who with a longitudinal perspective of his patient and a knowledge of his imaging results, diagnoses, and treatments (a knowledge certainly surpassing that of the ALJ and this Court) prescribed Bryan a cane and described the circumstances under which he needed that cane. A clearer example of an ALJ playing doctor would be hard to find. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings"). The Commissioner's argument that Dr. Hershkowitz's cane prescription still was not enough under SSR 96-9p as

it provided only that Bryan needed the cane "for unspecified activities inside of his home" and thus did not establish that Bryan needed a cane outside of his home falls flat. Dft's MSA (Doc. 18-1 at pg. 11). Not only did Dr. Hershkowitz explicitly describe the circumstances for which Bryan needed the cane (mobility-related activities of daily living in the home), the Commissioner also seems to forget that the regulations instruct the ALJ to consider a claimant's activities of daily living in evaluating the claimant's subjective symptoms. *See* 20 C.F.R. § 404.1529(c)(3)(i) (providing that factors considered relevant to a claimant's symptoms, such as pain, include the claimant's daily activities). Finally, Bryan testified frankly at the second hearing that he did not need his cane every day to walk. The ALJ made no mention of that in his Decision, and therefore again failed to confront evidence contrary to a stated reason he rejected Bryan's cane use (lack of an assistive device when he sought medical treatment).

**B**

The Court refrains from addressing Bryan's remaining arguments as the two above-identified errors alone warrant remand. In the event this matter is remanded, the ALJ should also be cognizant of Bryan's remaining points of error not addressed herein.

**V**

For the reasons set forth above, it is recommended that: 1) the Plaintiff's Motion for Summary Judgment (Doc. 13) be granted; 2) the Defendant's Motion for Summary Affirmance (Doc. 18) be denied; and 3) this case be remanded to the Commissioner of Social Security for further proceedings consistent with this Opinion Pursuant to 42 U.S.C. §405(g), Sentence Four.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days after service of this Report and Recommendation. FED. R. CIV. P. 72(b)(2); 28 U.S.C.

§ 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended.*

Entered on January 27, 2020.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE